1

2

3

4                          UNITED STATES DISTRICT COURT

5                               DISTRICT OF NEVADA

6    CHARLES JUAN PROCTOR,                        3:12-cv-00328-MMD-WGC

7                                  Plaintiff,     **REPORT & RECOMMENDATION OF**
                                                  **U.S. MAGISTRATE JUDGE**
8          v.

9    VAN HORN, et. al.,

10                                Defendants.

11

12          This Report and Recommendation is made to the Honorable Miranda M. Du, United

13   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28

14   U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is Plaintiff's

15   dispositive motion (Doc. # 75.)[1] Defendants filed an opposition (Doc. # 92) as well as their own

16   motion for summary judgment (Doc. # 89).[2] Plaintiff filed a response to Defendants' motion

17   (Doc. # 108),[3] and Defendants filed a reply (Doc. # 111).

18          After a thorough review, the court recommends that Plaintiff's motion be denied, and that

19   Defendants' motion be granted in part and denied in part.

20                                   **I. BACKGROUND**

21          At all relevant times, Plaintiff was an inmate in custody of the Nevada Department of

22   Corrections (NDOC). (Pl.'s Sec. Am. Compl., Doc. # 67 at 1.) The allegations giving rise to this

23   action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC).

24   (*Id*.) Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id*.) The

25   _____

26          [1] Refers to court's docket number.

27          [2] These documents are identical but were docketed separately by the Clerk to reflect that Defendants both
     opposed Plaintiff's motion and seek summary judgment on their own behalf.

28          [3] The declarations in support of his response can be found at Docs. # 110-1, # 110-2, # 110-3, # 110-4, and
     # 110-5.

1   defendants are Dr. Van Horn, a dentist at NNCC; NNCC's Dr. Karen Gedney; Lois Elliott, a

2   dental assistant at NCCC; Sonja "Missy" Gleason, a dental technician at NNCC; and Terri

3   Jacobs, NNCC's nursing director. (*See* Doc. # 67 (Pl.'s Sec. Am. Compl.); Doc. # 66 (Order

4   granting leave to amend to file Sec. Am. Compl.); and Doc. # 38 (granting motion to substitute

5   Elliot and Gleason in place of Jane Does 1 and 2).) On screening, the court determined Plaintiff

6   states colorable Eighth Amendment claims for deliberate indifference to his serious medical

7   needs related to the alleged delay and denial of necessary dental care. (Doc. # 7; Doc. # 66.)

8   ## II. LEGAL STANDARD

9       "The purpose of summary judgment is to avoid unnecessary trials when there is no

10   dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

11   F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary

12   judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,

13   525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

14   (1986). "The court shall grant summary judgment if the movant shows that there is no genuine

15   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

16   Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at

17   issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

18   250 (1986).

19       A party asserting that a fact cannot be or is genuinely disputed must support the
         assertion by:
20       (A) citing to particular parts of materials in the record, including depositions,
         documents, electronically stored information, affidavits or declarations,
21       stipulations (including those made for purposes of the motion only), admissions,
         interrogatory answers, or other materials; or
22       (B) showing that the materials cited do not establish the absence or presence of a
23       genuine dispute, or that an adverse party cannot produce admissible evidence to
         support the fact.

24   Fed. R. Civ. P. 56(c)(1)(A), (B).

25       If a party relies on an affidavit or declaration to support or oppose a motion, it "must be

26   made on personal knowledge, set out facts that would be admissible in evidence, and show that

27   the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

28       In evaluating whether or not summary judgment is appropriate, three steps are necessary:

(1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at

324.

> That being said,
>
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

## III. DISCUSSION

### A. Eighth Amendment Deliberate Indifference to Serious Medical Needs

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need

exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).  "'[A] prisoner need not prove that he was completely denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. Mar. 6, 2014). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

1    "A difference of opinion between a physician and the prisoner—or between medical

2    professionals—concerning what medical care is appropriate does not amount to deliberate

3    indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

4    Instead, to establish deliberate indifference in the context of a difference of opinion between a

5    physician and the prisoner or between medical providers, the prisoner "'must show that the

6    course of treatment the doctors chose was medically unacceptable under the circumstances' and

7    that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's

8    health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

9    Defendants do not appear to dispute that Plaintiff suffers from a serious medical need;

10   therefore, the court's analysis will focus on whether their alleged conduct amounts to deliberate

11   indifference.

12   **B. Summary of Evidence**

13   In February 2009, shortly after Plaintiff arrived at intake to NDOC's High Desert State

14   Prison (HDSP), he was sent temporarily to California to face felony charges. (Doc. # 67 at 3;

15   Doc. # 89 at 2; Doc. # 108 at 1.) In March 2010, while at the Los Angeles County Jail, he

16   suffered a broken jaw. (Doc. # 67 at 3; Doc. # 89 at 3; Doc. # 108 at 1.) He returned to HDSP in

17   October 2010. (Docs. # 89 at 3; Doc. # 89-1 at 2; Doc. # 108 at 2.) He saw a dentist at HDSP on

18   October 27, 2010 (Doc. # 67 at 3; Doc. # 90-1 at 2, 3; Doc. # 108 at 2), who noted that Plaintiff

19   had steel plates on both sides of his jaw with limited opening. (Doc. # 90-1 at 2.) The dentist

20   noted there was no popping, pain or crepitus. (*Id.*)

21   On January 15, 2011, Plaintiff sent a kite stating that he needed to have his remaining

22   teeth pulled, to be placed on a liquid diet while his gums healed, and have dentures made.

23   (Doc. # 90-2 at 2.) He was advised he would be seen when his name came up on the list. (*Id.*) He

24   saw Dr. Hanson at HDSP on January 24, 2011, who requested that Plaintiff be seen by

25   Dr. Sanders, who could better evaluate Plaintiff's dental concerns. (Doc. # 90-1 at 3; Doc. # 108

26   at 3-4.) Plaintiff saw Dr. Sanders on January 28, 2011. (Doc. # 90-1 at 3; Doc. # 108 at 4.) It was

27   noted that Plaintiff suffered a fracture while in prison in March 2010, and his jaw was wired shut

28   for six weeks, and then removed by an oral surgeon. (Doc. # 90-1 at 3.) Plaintiff reported that his

jaw would slip out of its socket two to four times a week. (*Id.*) X-rays were taken and Dr. Sanders determined that Plaintiff's teeth were in poor periodontal health, with bone loss, and recommended extraction of all remaining teeth for complete denture fabrication after the mandible[4] and maxilla[5] were aligned. (*Id.*) Dr. Sanders also stated that Plaintiff needed to be referred to an oral surgeon outside of the institution for further dental procedures. (*Id.*) Plaintiff could not stay for the extraction of several of the teeth that day because of custody issues, and was supposed to be seen again the following Monday. (*Id.*)

When Plaintiff saw Dr. Sanders again on January 31, 2011, it was noted that Plaintiff was in no pain, but did not want his teeth extracted that day; instead, he wanted all teeth extracted at once, to have his jaw fixed and reset, and then have dentures made. (*Id.*) Dr. Sanders noted that he did not make Plaintiff any promises, but said he would send the request to the Utilization Review Panel (URP) for a final determination. (*Id.*)

On February 1, 2011, Dr. Hanson and Dr. Sanders requested that Plaintiff be sent to NNCC to see Dr. Van Horn or Dr. Remsen, and then Dr. Pincock. (Doc. # 90-3 at 2-3.) They stated that given the shape his mouth was in, routine and emergency dental treatment could not be done in an institutional setting unless surgical intervention occurred. (*Id.* at 3.) The request was approved on February 8, 2011. (*Id.* at 2.) Dr. Sanders noted on February 9, 2011, that Plaintiff was approved by the URP for transfer to NNCC for further evaluation. (Doc. # 90-1 at 3.)

Plaintiff was first transferred to Nevada State Prison (NSP), where he saw Dr. Van Horn. (Doc. # 108 at 7; Doc. # 110-2 at 1.) On March 27, 2011, it was noted by Dr. Van Horn that Plaintiff did not want any teeth extracted until he was seen by an oral surgeon. (Doc. # 90-1 at 3.) Plaintiff claims he did not say this, and claims he did not know it was an option to see the oral surgeon. (Doc. # 108 at 7.) In a subsequently filed declaration, Plaintiff states that Dr. Van Horn asked why he did not have two of the teeth extracted at HDSP. (Doc. # 110-2 at 1.) Plaintiff asserts that he responded that he grinds his teeth and wanted a mouth guard and HDSP did not

---

[4] The lower jaw bone. http://www.merriam-webster.com/dictionary/mandible, last visited Jan. 22, 2015.

[5] The upper jaw bone. http://www.merriam-webster.com/dictionary/maxilla, last visited Jan. 22, 2015.

have one, and he knew he was being submitted for transfer to NNCC and did not want to start the process in one place only to have it finished in another. (Doc. # 110-2 at 1.) Plaintiff maintains that he did not refuse to have his teeth pulled at NSP; nevertheless, that same day, Dr. Van Horn sent a request to the URP requesting that Plaintiff be seen by the oral surgeon, Dr. Pincock. (Doc. # 90-3 at 4.) This was approved by the URP on May 3, 2011. (*Id.*)

Plaintiff was transferred from NSP to NNCC on or about April 7, 2011. (Doc. # 108 at 7; Doc. # 90-5 at 7 (a progress note dated April 8, 2011, which mentions that Plaintiff was at NNCC for a surgical consultation with Dr. Pincock as a result of a jaw fracture in March 2010).)

On May 4, 2011, the progress notes state that Plaintiff was scheduled for review but did not keep his appointment. (Doc. # 90-1 at 3.) On May 10, 2011, Plaintiff sent a kite asking whether he had been approved for surgery and was advised on May 12, 2011 by defendant Elliott that Dr. Van Horn would review his chart again. (Doc. # 67 at 16; Doc. # 75 at 31.)

On May 20, 2011, Plaintiff sent a kite to Dr. Van Horn, stating that he had been at NNCC awaiting approval for his jaw surgery since April 7, 2011, and was having a difficult time chewing and was experiencing sharp pain. (Doc. # 67 at 17; Doc. # 75 at 32.) He requested surgery as soon as possible. (*Id.*) Defendant Elliott responded on May 26, 2011: "You were scheduled to see Dr. Van Horn for a new eval-But you missed apt. 5-4-11. He needs to see you to write a new consult." (*Id.*)

On May 29, 2011, Plaintiff sent a kite asking when he was scheduled to see Dr. Van Horn. (Doc. # 67 at 18; Doc. # 75 at 33.) He was told on May 31, 2011, by defendant Elliott: "You were seen by him at NSP in March 2011 and he has looked at your chart again." (*Id.*)

On June 2, 2011, Plaintiff sent another kite stating the following: "If I had been seen by Dr. Van Horn at NSP in March of 2011, then why was I scheduled to see him on 5-4-11, that I was to have missed? And if he needed to see me on 5-4-11 in order to write a new consultation on my jaw, then doesn't he still need to see me in order to do that?" (Doc. # 75 at 34.) The next day he received this response from defendant Elliott: "He reviewed your chart and rewrote the order. So its up to the next step." (*Id.*)

On June 9, 2011, Plaintiff sent a kite asking whether Dr. Van Horn had reviewed his

1   chart, what his original order said, and how to proceed. (Doc. # 67 at 19.) On June 14, 2011,

2   defendant Elliott responded: "These questions will have to be answered by review board." (*Id.*)

3   John Peery, NNCC's former nursing director, also responded: "The response from Utilization

4   Review is pending." (*Id.*)

5          On June 16, 2011, Plaintiff sent a kite asking what the order referred to in the previous

6   kite response said, and asked what the next step was. (Doc. # 75 at 35.) On July 7, 2011, he

7   received a response from defendant Gleason: "This procedure with the panel is simply

8   procedures every one has to follow, and they do look @ your file. You will be notified of the

9   decision. Please do not rekite until your [sic] notified." (*Id.*)

10          On June 22, 2011, Plaintiff sent a kite asking what the Utilization Review was, and why

11   his jaw surgery was pending before them. (Doc. # 75 at 36.) On July 7, 2011, defendant Gleason

12   responded: "The UR panel is a panel that makes the decisions whether or not a procedure is

13   approved or not approved! Dr. Van Horn is not on this panel (as previously asked in one of your

14   other kites) you need to be patient and you'll be notified of the decision. Please do not rekite until

15   the decision has been made." (*Id.*)

16          Plaintiff saw Dr. Pincock on July 6, 2011. (Doc. # 90-4 at 2.) Dr. Pincock's notes indicate

17   that Plaintiff was referred to him for evaluation of a mandibular deformity. (*Id.*) Dr. Pincock

18   stated that Plaintiff suffered from multiple fractures while imprisoned in Los Angeles County.

19   (*Id.*) He underwent open reduction and internal fixation of the fractures on April 9, 2010, and

20   was left in intermaxillary fixation for about six weeks, and his jaw felt out of position and caused

21   him occasional pain. (*Id.*) On examination, Dr. Pincock noted the following: an obvious

22   deformity of the lower face, with a grossly protrusive mandible; "an associated severe Class III

23   dental relationship;" missing multiple teeth; a grossly over-closed mandible; the remaining teeth

24   had supererupted; and severe periodontal disease and oral sepsis. (*Id.*) His mandibular range of

25   motion was noted as being somewhat limited. (*Id.*) Dr. Pincock diagnosed Plaintiff as follows:

26   oral sepsis; malunion of multiple mandibular fractures which are likely exacerbating a pre-

27   existing prognathism; no mandibular posterior dentition. (*Id.*) He opined that in order to properly

28   address the deformity, all of Plaintiff's infected teeth would have to be removed, which "likely

1  represents his remaining dentition." (*Id*.) Once that occurred, Dr. Pincock stated that further

2  consideration could be given to reconstructive surgery. (*Id*.)

3       On July 11, 2011, Plaintiff sent a kite asking who the doctor was that he saw on July 6,

4  2011, and was advised it was Dr. Pincock. (Doc. # 75 at 37.)

5       Dr. Pincock's notes were received by NNCC on July 18, 2011. (Doc. # 90-5 at 7.)  The

6  recommendation for extractions was noted, and it was stated that Plaintiff would be scheduled

7  with Dr. Van Horn. (*Id*.)

8       On July 31, 2011, Plaintiff asked what the purpose was for his visit with Dr. Pincock, and

9  requested Dr. Pincock's conclusions. (Doc. # 75 at 41.) Defendant Gleason responded on

10  August 3, 2011 that she would make an appointment with the dentist to go over the results. (*Id*.)

11       An appointment slip reflects that Plaintiff had an appointment with the dentist on

12  August 10, 2011. (Doc. # 67 at 27; Doc. # 75 at 42.) Plaintiff sent a kite that day saying that he

13  did not see the dentist, and asked to have his appointment rescheduled. (Doc. # 67 at 28; Doc. #

14  75 at 43.) He was advised by defendant Gleason that he was still on the list and would be notified

15  of his new appointment date. (*Id*.) Plaintiff was given appointment dates on August 25, 2011,

16  August 31, 2011 and September 1, 2011, but sent kites indicating that he did not see the dentist

17  on these dates either, and requested that his appointment be rescheduled. (Doc. # 67 at 29-35;

18  Doc. # 75 at 44-49, 51.) Plaintiff was eventually seen on September 6, 2011. (*See id*. at 47-49,

19  52.) Later that day, he asked for another appointment with the dentist to discuss some questions

20  he had. (Doc. # 75 at 52.) He was advised on September 16, 2011 that he would be notified of an

21  appointment. (*Id*.)

22       On September 23, 2011, Plaintiff's teeth were extracted. (Doc. # 90-1 at 3-4; Doc. # 89-8

23  ¶ 9.) He was given Amoxicillin and ibuprofen pain packs and Tylenol 3. (Doc. # 90-1. at 4.)

24       On October 11, 2011, Plaintiff sent a kite indicating that his gums and the right-side of

25  his jaw were causing him pain after his teeth had been pulled, and he requested to see the dentist.

26  (Doc. # 67 at 20; Doc. # 75 at 53.) Defendant Gleason advised him that he would be scheduled

27  for an appointment. (*Id*.)

28       On October 18, 2011, Plaintiff sent a kite stating that it had been three weeks since he

1   had his teeth pulled and his gums and right-side of his jaw still hurt, and he once again requested

2   to see the dentist. (Doc. # 67 at 21; Doc. # 75 at 50.) He was advised by defendant Gleason on

3   November 3, 2011, that he was placed on the priority dental list and would be seen as soon as the

4   schedule could accommodate him. (*Id.*)

5          On October 30, 2011, Plaintiff sent another kite asking to see the dentist regarding the

6   pain with his gums and jaw. (Doc. # 67 at 22; Doc. # 75 at 55.) In response, defendant Gleason

7   told him: "Your dental is complete. You will be seeing an oral surgeon for your jaw bone in the

8   near future." (*Id.*) On the same day, Plaintiff sent another kite asking whether he had been

9   approved for jaw surgery yet. (Doc. # 75 at 56.) On November 2, 2011, John Peery responded

10  that Plaintiff had not yet been approved, the matter was still under discussion, and that Plaintiff

11  would not be told when the surgery would occur because of security concerns. (*Id.*)

12         On November 3, 2011, Dr. Gedney sent a request that Plaintiff be referred back to

13  Dr. Pincock. (Doc. # 90-3 at 5.) She mentioned that Dr. Pincock had recommended

14  reconstructive surgery. (*Id.*) The document does not indicate whether the request was approved

15  or denied. (*Id.*) Another version of this request contains additional notes indicating that Plaintiff's

16  teeth had been extracted by Dr. Van Horn and that he needed to heal for several months

17  following the extraction, and would be re-evaluated by Dr. Pincock on February 7, 2012. (*Id.* at

18  6.) As such, Defendants contend that Dr. Gedney's request was approved on a deferred basis.

19         On November 6, 2011, Plaintiff sent a kite asking John Peery whether he was a member

20  of the URP, and if not, why he was answering kites directed to the URP. (Doc. # 75 at 54.) John

21  Peery responded that he was not a member of the URP, but he answered most kites, and that

22  there was no mechanism for Plaintiff to personally address the URP. (*Id.*)

23         On November 9, 2011, Plaintiff sent a kite saying that he had not seen the dentist and the

24  pain in his mouth was causing inconsistencies in his sleeping patterns. (Doc. # 75-1 at 1.) On

25  December 1, 2011, he received the following response: "You no longer need to see the dentist.

26  Your treatment with him is complete. Your oral surgeon Dr. Pincock is who will be working on

27  your jaw. No need to rekite-you will be notified." (*Id.*)

28         Plaintiff sent a kite on November 27, 2011, asking about the status of the approval of his

surgery by the URP, which he had been advised was still being discussed. (Doc. # 75 at 58.) John Peery responded on November 28, 2011, that Plaintiff was scheduled for surgery in February 2012. (*Id.*)

On November 27, 2011, Plaintiff sent another kite asking about Dr. Pincock's conclusions and recommendations after their meeting in July 2011. (Doc. # 75 at 57.) On November 28, 2011, Plaintiff was once again advised: "Your surgery is scheduled in February 2012." (*Id.*)

Plaintiff sent another kite on November 27, 2011, directed to the URP, asking whether he had been approved for jaw surgery, and was advised in response on January 3, 2012, that he had an evaluation with the oral surgeon the following month. (Doc. # 75-1 at 5.)

In yet another kite dated November 27, 2011, Plaintiff asked what Dr. Van Horn originally ordered for him when he supposedly saw Plaintiff in March 2011, and the purpose of the subsequently scheduled appointment on May 4, 2011. (Doc. # 75 at 59.) Defendant Gleason responded: "The kites your [sic] referring to are old kites. Your dental is complete." (*Id.*)

Plaintiff sent a kite to John Peery on November 30, 2011, thanking him for advising Plaintiff that the surgery was scheduled in February 2012, and asking him whether the URP specifically approved the surgery. (Doc. # 75-1 at 4.) John Peery responded on December 28, 2011: "Be patient, this will follow in due course when you're fully healed." (*Id.*)

On December 3, 2011, Plaintiff complained of pressure point pain in his mouth. (Doc. # 90-1 at 4.)

Plaintiff sent an emergency grievance on December 6, 2011, stating that he had his teeth pulled on September 23, 2011, in preparation for jaw surgery in February 2012, and his gums and the right side of his jaw were still causing him pain. (Doc. # 75-1 at 2-3.) He referenced the kites he had sent kites about his pain on October 11 and 18, 2011, and that he had been told he was placed on the dental priority list, but he had still not seen the dentist. (*Id.*) He requested to see the dentist as soon as possible because the pain was "unbearable." (*Id.*)

Dr. Van Horn saw Plaintiff on December 7, 2011. (*Id.; Doc. # 89-8 ¶ 10.) According to Dr. Van Horn, the pain Plaintiff was experiencing was a result of an occlusion[6] at the

---

[6] "[T]he bringing of the opposing surfaces of the teeth of the two jaws into contact; *also*: the relation

1    periocoronal notch (mandible) and maxilla. (Doc. # 89-8 (Van Horn Decl.) at 3 ¶ 10.)

2    Dr. Van Horn claims that he discussed with Plaintiff that he could anesthetize him and smooth

3    the bone, or Plaintiff could wait to address the issue with the oral surgeon, whom he was

4    scheduled to see in February 2012. (*Id.*) Plaintiff opted to wait for the surgery. (Doc. # 90-1 at 4;

5    Doc. # 89-9 at 4

6    ¶ 10.) Dr. Van Horn determined Plaintiff was not in need of any prescription medication, and

7    advised him he could request ibuprofen from medical staff, if necessary. (*Id.*)

8         Plaintiff saw Dr. Pincock again on February 7, 2012. (Doc. # 90-4 at 3.) He ordered lab

9    work, and stated that if the results were normal he would consider surgery. (Doc. # 90-4 at 5.)

10   Dr. Pincock's notes are not entirely legible, but according to Dr. Van Horn, Dr. Pincock ordered

11   blood work to rule out underlying bone disease before considering whether to perform the

12   bilateral split sagittal osteotomy[7] to reconstruct Plaintiff's jaw. (Doc. # 89-8 at 4 ¶ 11.)

13        In addition, Dr. Van Horn states that Dr. Pincock requested that Dr. Van Horn evaluate

14   Plaintiff to determine whether aggressive osteopathy of the anterior mandible would achieve a

15   closer alignment of the jaw sufficient to accommodate dentures for Plaintiff. (Doc. # 89-8 at 4 ¶

16   11.) Dr. Van Horn went to Plaintiff's cell on February 21, 2012, to evaluate Plaintiff as requested

17   by Dr. Pincock. (*Id.* ¶ 12.) Dr. Van Horn states that it was not unusual to evaluate lockdown

18   inmates, such as Plaintiff, in their cell if the evaluation did not require specialized equipment as

19   this eliminated the burden of custody staff having to transport the inmate to the dental clinic.

20   (*Id.*) Dr. Van Horn states that on this occasion, Plaintiff was belligerent and refused

21   Dr. Van Horn's attempts to examine his jaw. (*Id.*; Doc. # 90-1 at 4.))

22        Plaintiff sent a grievance on February 24, 2012, stating that Dr. Van Horn came to his

23   cell on February 21, 2012, asking to examine Plaintiff's mouth. (Doc. # 75-1 at 7-9.) Plaintiff

24   claims that he wanted to ask Dr. Van Horn some questions, but before he could do so, he

25   contends that the dentist and his assistant stormed off, and two hours later the officer came back

26

27   between the surfaces when in contact." http://www.merriam-webster.com/dictionary/occlusion, last visited Jan. 22, 2015.

28        [7] A surgical procedure used to correct dentofacial abnormalities, including mandibular deformities. http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3805998, last visited Jan. 22, 2015.

asking Plaintiff to sign a "refusal slip," but Plaintiff would not sign it, maintaining that he did not

refuse treatment. (*Id*.) He further stated that he still needed to see the dentist. (*Id*.) He received

this response:

> The dentist and his assistant were there to simply check your mouth and to assess
> and evaluate you for corrective jaw surgery. You became belligerent,
> uncooperative, and you refused to come out of your cell. You will see the dentist.
> However, improper behavior on your part will not be tolerated. So be respectful,
> follow the dentist's advice, and keep him informed regarding your dental issues.
> Grievance denied.

(Doc. # 75-1 at 6.)

The lab work requested by Dr. Pincock came back normal. (Doc. # 90-6 at 3.)

Dr. Gedney noted on March 8, 2012, that the results should be sent to Dr. Pincock, and it should

be determined whether he recommended going forward with the surgery. (*Id*.)

Dr. Van Horn went to Plaintiff's cell again on April 3, 2012, to evaluate his jaw

alignment. (Doc. # 89-8 at 4 ¶ 13.) Plaintiff allowed Dr. Van Horn to evaluate him this time, and

because of his exaggerated under bite, Dr. Van Horn did not find Plaintiff to be a good candidate

for aggressive osteopathy. (*Id*.; Doc. # 90-1 at 4.) According to Dr. Van Horn, so much bone

would have to be removed to allow for proper alignment of the jaw, that there would be little to

no bone ridges left to retain the dentures. (Doc. # 89-8 at 4 ¶ 13.) It was Dr. Van Horn's opinion

that dentures should be attempted to see how he did with them, and if he had an exceptionally

hard time, surgery could be considered. (*Id*.) If surgery was needed and approved, new dentures

could be made again once he healed. (*Id*.) An evaluation letter was to be sent back to

Dr. Pincock. (*Id*.)

Plaintiff sent a kite on April 26, 2012, referencing the kite response of November 28,

2011, where he was told he would have jaw surgery in February, and asked why the surgery had

not been performed. (Doc. # 75-1 at 10.) On May 2, 2012, Nurse Snider responded to Plaintiff:

"Dr. Van Horn will call you over to have impressions done for dentures. This may eliminate the

need for surgery." (*Id*.)

On May 6, 2012, Plaintiff sent a kite to the nurse stating that he had been sent to NNCC

from HDSP for surgery because the dentists there said that his jaw alignment did not allow for

dentures to be made. (Doc. # 75-1 at 11.) Plaintiff indicated he did not understand, therefore,

1  why his scheduled surgery was cancelled so that denture impressions could be made. (*Id.*) The

2  nurse responded the following day: "This is a [sic] approved treatment for your dental problem-

3  per dental." (*Id.*)

4      Plaintiff sent a kite on May 17, 2012, again referencing his kite of November 2011 where

5  he complained of pain in his mouth, and stated that the pain was still present. (Doc. # 75-1 at 12.)

6  He referenced a response in his grievance which indicated that he would no longer be seeing the

7  dentist, and would be proceeding with Dr. Pincock, the oral surgeon. (*Id.*) Therefore, he asked

8  why the dentist needed to take impressions for dentures. (*Id.*)

9      Dr. Van Horn saw Plaintiff on May 24, 2012, and discussed making him dentures. (Doc.

10  # 90-1 at 4; Doc. # 89-8 ¶ 14.) Dr. Van Horn asserts that he told Plaintiff that an alternative was

11  to try alveoloplasty[8], but explained that the bone loss may result in dentures that did not retain

12  well. (*Id.*) He opined that stabilizing the jaw with dentures was necessary before other more

13  aggressive procedures could be considered. (*Id.*) Plaintiff stated he would think about it and no

14  denture impressions were made. (*Id.*)

15      Plaintiff sent a kite to John Peery on May 28, 2012, asking whether the URP had

16  approved him for surgery, and Peery responded on June 4, 2012: "Not yet." (Doc. # 108 at 49.)

17      Plaintiff received a response to his May 17, 2012 kite on May 30, 2012, and was advised

18  that he had been placed on the priority care dental list and would be seen as soon as the schedule

19  would permit (although Plaintiff had seen Plaintiff Dr. Van Horn on May 24, 2012). (Doc. # 75-1

20  at 12.)

21      Plaintiff sent a kite to John Peery on July 6, 2012, referencing Peery's prior representation

22  that his surgery was to take place in February 2012, but he had yet to have the procedure, and

23  asked why the procedure had not taken place. (Doc. # 75-1 at 14.) John Peery responded on

24  July 31, 2012: "Apparently that was changed due to a new plan of action by our dentist for now."

26  [8] This is "surgical shaping of the dental alveoli and alveolar processes especially after extraction of several
27  teeth or in preparation for dentures." http://www.merriam-webster.com/dictionary/alveoplasty, last visited Jan. 22,
2015. "Alveoli" are "socket[s] in the jaw for [the] t[ee]th." http://www.merriam-webster.com/dictionary/alveolus,
28  last visited Jan. 22, 2015.

(*Id.*)

Plaintiff sent a kite on July 19, 2012, referencing a prior kite response which indicated he would be placed on the priority dental care list. (Doc. # 75-1 at 13.) He stated that as of July 19, 2012, he had not yet seen the dentist (he did not mention the May 24, 2012 visit with Dr. Van Horn), and said he was still in pain. (*Id.*) He also asked why there had been a delay in fixing his jaw. (*Id.*) He received this response: "We are scheduling you to come over for impressions." (*Id.*)

Dr. Van Horn saw Plaintiff on August 9, 2012. (Doc. # 90-1 at 4.) Plaintiff reported that he was confused. (*Id.*) Dr. Van Horn said that he once again told Plaintiff that dentures could be fabricated for his current condition, or he could undergo alveoloplasty, healing and then dentures. (Doc. # 90-1 at 4; Doc. # 89-8 ¶ 15.)[9] Dr. Van Horn states that Plaintiff refused either option, and indicated he would not do anything except see Dr. Pincock for jaw surgery. (*Id.*) Dr. Van Horn emailed the medical director and nursing directors that Plaintiff was only going to be happy with surgery from Dr. Pincock. (*Id.*) As such, Dr. Van Horn submitted another referral for Plaintiff to see Dr. Pincock on September 12, 2012, which was approved by the URP the same day. (Doc. # 89-8 ¶ 16; Doc. # 90-1 at 4; Doc. # 90-3 at 7.) The reason given for the referral was: "Aggressive alveo/osteoplasty at maxilla and mandible to allow for closer ridge alignment and denture placement." (Doc. # 90-3 at 7.)

Plaintiff sent a kite on September 26, 2012, asking about the status of his jaw surgery, and stated that he was still in pain. (Doc. # 67 at 25; Doc. # 75-1 at 15.) In response he was advised that his surgery had just been approved, and was in the process of being scheduled. (*Id.*) The respondent asked that he be patient. (*Id.*)

Plaintiff saw Dr. Pincock on October 9, 2012, and stated he wanted his jaw problems fixed. (Doc. # 90-4 at 3.) Dr. Pincock explained to Plaintiff that it was premature to consider doing anything to his jaw until simple problems, like stabilizing his bite with a denture, had been addressed. (*Id.*) He disagreed and said he had already started a lawsuit. (*Id.*) Dr. Pincock told

---

[9] Plaintiff disputes that he was offered the alveoloplasty option. (Doc. # 108 at 19.) He does not appear to dispute, however, that he opted to wait for jaw surgery in any event.

Plaintiff under those conditions he would not continue to treat him. (*Id*.)

On October 11, 2012, Plaintiff sent a kite to Peery asking whether the URP had approved his jaw surgery. (Doc. # 67 at 12, 26; Doc. # 75-1 at 16.) On October 15, 2012, Peery responded that the surgery had been approved, but he could not give Plaintiff a date yet. (*Id*.)

On January 10, 2013, Dr. Bannister and Terri Jacobs sent a request for Plaintiff to be referred to Dr. Gray, another oral surgeon, which was approved. (Doc. # 90-3 at 8.)

Plaintiff saw Dr. Gray on January 28, 2013. (Doc. # 90-4 at 6-8.) Dr. Gray noted that Plaintiff complained of right mandibular discomfort, sensation of sensitivity gingival tissues, episodic electrical sharp and dull pains. (*Id*.) Dr. Gray stated that Plaintiff's underlying bone was "somewhat irregular," but that Plaintiff did not have dentures. (*Id*. at 7.) He noted that there was no apparent pain when he palpated over the area of the fracture plates. (*Id*.) Dr. Gray assessed Plaintiff as having probable trigeminal neuralgia, secondary to his mandibular fractures. (*Id*.) He advised Plaintiff that based on where the fracture plates were placed they could cause inferior alveolar nerve damage, which could result in a complaint of anterior gingival numbness and neuralgia type pain. (*Id*.) He did not recommend removing the plates. (*Id*.) He stated that if the pain continued or worsened, Plaintiff should see a neurologist, and that Neurontin could be helpful, "[h]owever, usually just understanding the origin of the pain is enough for patients to simply live with the episodic discomfort." (*Id*. at 8.) He concluded that surgical treatment was not indicated at that time. (*Id*.)

Plaintiff sent a kite on June 3, 2013, asking for ibuprofen for his mouth pain. (Doc. # 75-1 at 28.) The response stated: "Do you have dental problems?" (*Id*.)

Plaintiff saw a dentist on July 1, 2013. (Doc. # 90-1 at 5.) He had an elevated root tip extracted which was causing him some sensitivity. (*Id*.)

On August 2, 2013, Plaintiff noted that the ibuprofen was having little effect anymore on his jaw pain, and asked to be seen regarding this issue. (Doc. # 90-2 at 3.)  He was scheduled to see a provider in August. (*Id*.) On August 9, 2013, Plaintiff sent a kite stating that he was supposed to have been seen in July, and was rescheduled for August, but had not yet been seen. (Doc. # 90-2 at 4.) He was advised he would be seen that week. (*Id*.) Plaintiff was issued an

ibuprofen pain pack on August 23, 2013. (Doc. # 90-5 at 6.) He was subsequently scheduled for an appointment on September 12, 2013. (Doc. # 90-5 at 6.)

Plaintiff sent a kite on September 12, 2013, stating that he arrived at NNCC on April 7, 2011, seeking approval for jaw surgery, and on October 15, 2012, John Peery told him in response to a kite that the surgery had been approved by the URP. (Doc. # 67 at 11; Doc. # 75-1 at 24.) He asked whether he would be scheduled any time soon for the surgery. (*Id*.)

Progress notes on September 12, 2013, indicate that Plaintiff was seen regarding his knee pain. (Doc. # 90-5 at 6.) The notes also mention his jaw issue, and state that Plaintiff was sent to NNCC in 2011 as a result of his jaw problem, and that Dr. Pincock subsequently refused to see him. (*Id*.) Plaintiff indicated he had all of his teeth removed by Dr. Van Horn, but nothing had happened since. (*Id*.) The notes further state that the last comment from the specialist indicated that surgery was not recommended. Notwithstanding the specialist's comment, the provider stated Plaintiff would be referred back to the dentist. (*Id*.)

On September 20, 2013, an ibuprofen pain pack was issued. (Doc. # 90-5 at 5.)

Plaintiff was seen by a nurse on September 26, 2013, related to his left knee pain. (Doc. # 90-5 at 5.) The progress note also mentions jaw pain, but does not discuss it in any further detail. (*Id*.)

On October 3, 2013, Terri Jacobs responded to Plaintiff's September 12, 2013 kite asking whether he would be scheduled for surgery. (Doc. # 67 at 11; Doc. # 75-1 at 24.) She stated that Plaintiff saw Dr. Gray on January 28, 2013, and surgery had not been recommended. (Doc. # 75-1 at 24.)

Plaintiff sent Terri Jacobs a kite on October 7, 2013, advising her that he had been at NNCC from two and a half years seeking approval for his jaw surgery. (Doc. # 75-1 at 26.) He stated that he did not recall a Dr. Gray, and that NDOC had used Dr. Pincock for oral surgery appointments, and had seen Dr. Pincock several times. (*Id*.) As such, he asked why he would have been sent to see Dr. Gray. (*Id*.) Terri Jacobs responded on October 10, 2013, that Plaintiff had seen Dr. Gray on January 31, 2013, and "no surgery was written to be done." (*Id*.)

Plaintiff complained of jaw pain on October 24, 2013. (Doc. # 90-5 at 5.) He was given a

bottle of ibuprofen and was instructed to kite if he had no improvement. (*Id.*)

Plaintiff was seen on November 6, 2013, and was issued a pain pack. (Doc. # 90-5 at 5.) On November 18, 2013, he stated that the ibuprofen helped the pain in his knee and jaw and requested that his naproxen be renewed, and the nurse noted the provider would be asked. (*Id.*)

Plaintiff sent Terri Jacobs another kite on November 25, 2013, asking for a response to his prior kite asking why he would have been sent to Dr. Gray. (Doc. # 67 at 13; Doc. # 75-1 at 27.) He said that he found some notes he made regarding his visit to Dr. Gray, but still did not understand why he saw Dr. Gray, and not Dr. Pincock, whom he had seen previously. (*Id.*) He also asked whether the URP had approved him for surgery in any event. (*Id.*) Terri Jacobs responded on December 3, 2013, stating that the NNCC provider sent Plaintiff for another opinion from Dr. Gray, and no surgery was ordered by Dr. Gray. (*Id.*)

On January 7, 2014, Plaintiff was issued a pain pack for chronic jaw pain. (Doc. # 90-5 at 5.)

Plaintiff was transferred to Lovelock Correctional Center on January 14, 2014. (Doc. # 90-5 at 4.) Plaintiff sent a kite on January 18, 2014, stating that he had been transferred to NNCC two and a half years prior related to his jaw problems, and for the time he had been there had been able to obtain ibuprofen as needed, and wanted to know how to achieve this at Lovelock Correctional Center. (Doc. # 90-2 at 5.) On January 23, 2014, it was noted that he had knee pain as well as jaw pain, and he was prescribed Neurontin. (Doc. # 90-5 at 4.)

Plaintiff returned to NNCC in March 2014 to have his knee evaluated by two specialists. (Doc. # 89 at 7; Doc. # 90-5 at 2-3.)

On March 24, 2014, Plaintiff sent a kite to Terri Jacobs referencing previous kite responses from John Peery that the surgery was scheduled for February 2012, and asked Jacobs why the surgery did not take place. (Doc. # 75-1 at 25.) Terri Jacobs responded on March 31, 2014, that Plaintiff was sent out to see Dr. Gray and "surgery was not necessary." (*Id.*)

Plaintiff saw Dr. Gedney on April 10, 2014, related to his knee pain, but she also discussed his jaw. (Doc. # 89 at 7; Doc. # 90-5 at 2-3; Doc. # 110-1 at 1.) Her notes state that Plaintiff claimed that he broke his jaw in California and it was not fixed correctly, and he came

to HDSP and found out it was fractured, which was why his dentures did not fit. (Doc. # 90-5 at 3.) She reviewed his history which showed that he had a procedure in California on April 9, 2010, and on February 16, 2010, the HDSP dentist referred him to NNCC to see a dentist. (*Id*.) He saw Dr. Pincock in July, who recommended reconstructive surgery after Plaintiff had his teeth removed. (*Id*.) He had the teeth removed, and then needed to heal, and was supposed to be re-evaluated by Dr. Pincock on February 7, 2012. (*Id*. at 2-3.) Plaintiff saw Dr. Pincock on February 7, 2012, who advised him that he wanted to rule out Padgett's disease, which was done. (*Id*. at 2.) In October 2012, mandible surgery was recommended by Dr. Van Horn. (*Id*.) Plaintiff saw Dr. Pincock again on October 9, 2012, and Plaintiff started talking about a lawsuit and Dr. Pincock said he would not continue to treat Plaintiff. (*Id*.) On January 28, 2013, he was sent to Dr. Gray, who said surgery was not indicated at that time. (*Id*.) Dr. Gedney then noted that Plaintiff had issues with glaucoma and his knees and did not bring up his jaw again until April 10, 2014. (*Id*.) She examined him and indicated he had a deformed jaw, and noted that Plaintiff still wanted reconstructive surgery. (*Id*.; Doc. # 110-1 at 1.) Dr. Gedney said she would refer the matter back to the URP and see if they are willing to send him to another oral surgeon. (Doc. # 90-5 at 3.)

On April 10, 2014, Dr. Gedney submitted the request to the URP that a bilateral split sagittal osteotomy be performed by an oral surgeon other than Dr. Pincock or Dr. Gray. (Doc. # 90-3 at 9.) She stated that Plaintiff was unable to have dentures that fit, and cannot bring his gums together to chew, and wanted to go through with surgery. (*Id*.) She noted that the surgery was previously authorized, but when Plaintiff mentioned lawsuits, Dr. Pincock refused to do the surgery. (*Id*.) The URP responded that Plaintiff should be sent to HDSP to be seen by an oral surgeon. (*Id*.) Dr. Gedney requested that Plaintiff be transferred to HDSP to see an oral surgeon on April 16, 2014. (*Id*. at 10.) Plaintiff was then transferred to HDSP on April 29, 2014. (Doc. # 108 at 54; Doc. # 110-1 at 4.)

Plaintiff was scheduled to see a contract oral surgeon based in the Las Vegas area in July 2014. (Doc. # 89-9 ¶ 4.) According to Plaintiff, he did not see an oral surgeon or even the HDSP dentist, but was returned to NNCC on May 22, 2014. (Doc. # 108 at 55; Doc. # 110-1 at 4.) On

1   June 18, 2014, Plaintiff saw Dr. Gedney at NNCC. (Doc. # 108 at 58; Doc. # 110-3 at 1.) She

2   said there had been a mishap at HDSP, and that Plaintiff would be sent back to HDSP so that he

3   could see an oral surgeon in the Las Vegas area. (*Id.*)

4         Plaintiff then states that on July 22, 2014, he was taken to the office of Dr. Swanson in

5   Las Vegas. (Doc. # 108 at 56; Doc. # 110-5 at 1.) Plaintiff asserts that Dr. Swanson told him that

6   the surgery he sought was cosmetic, elective, and non-life threatening, and therefore, not

7   necessary, and also mentioned that Plaintiff did not have insurance. (*Id.*) Dr. Swanson took

8   x-rays, reviewed them, and told Plaintiff that the bone had healed too much around the fracture

9   plates and it was too late for him to do anything. (Doc. # 108 at 57; Doc. # 110-5 at 2.) He also

10  said that if he were to do the surgery, Plaintiff would be in the hospital for forty-eight hours,

11  which was unthinkable in light of the fact that Plaintiff did not have insurance. (*Id.*)

12  **C. Summary of Argument**

13       **1. Defendants' Argument**

14       Defendants maintain that they were not deliberately indifferent to Plaintiff's serious

15  medical needs. They claim that Plaintiff presents a complicated dental situation and NDOC has

16  consistently sought the opinion of specialists and deferred to them; has approved Plaintiff for

17  surgery if an oral surgeon deems it appropriate; and has diligently provided Plaintiff with care.

18  (Doc. # 89 at 9-10.) They contend that he did not receive jaw surgery from Dr. Pincock because

19  he resisted the preliminary steps necessary, and threatened litigation, which caused Dr. Pincock

20  to terminate care. (*Id.*) He then saw another oral surgeon, Dr. Gray, who did not think surgery

21  was indicated. (*Id.*)

22            **a. Dr. Gedney**

23       Dr. Gedney asserts that she was not deliberately indifferent as Plaintiff alleges, by being a

24  member of the URP, because the URP has approved the surgery, but an oral surgeon has not

25  been willing to perform the procedure and the URP cannot compel them to do so. (Doc. # 89 at

26  10-12.) (*Id.*) She points out that the URP approved each request sent to them regarding Plaintiff's

27  jaw. (*Id.* at 10-11.) The February 1, 2011 request to see an oral surgeon was approved on

28  February 8, 2011, and Plaintiff saw Dr. Van Horn and then Dr. Pincock. (*Id.* at 10.) The second

1    request to see an oral surgeon submitted on March 27, 2011, was approved one month later, and

2    Plaintiff was seen by Dr. Pincock. (*Id.*) The November 3, 2011 request to see an oral surgeon

3    was approved with the notation that Plaintiff's mouth needed to heal from the extractions before

4    he could be re-evaluated by Dr. Pincock in February 2012, and he saw Dr. Pincock on

5    February 7, 2012. (*Id.*) Next, the request for approval of the surgery on September 12, 2012 was

6    approved the same day. (*Id.* at 11.) Plaintiff saw Dr. Pincock in October 2012, and when Plaintiff

7    threatened litigation, he refused to treat Plaintiff. Plaintiff was subsequently referred to another

8    orthopedic surgeon in January 2013, and saw Dr. Gray at the end of that month. (*Id.*)

9         Dr. Gedney further contends that any delay in approval of the jaw surgery by the URP

10   did not result in harm to Plaintiff. (*Id.*) She states that the URP has approved Plaintiff for surgical

11   procedures by a contracted oral surgeon since September 2012, but one oral surgeon refused to

12   treat Plaintiff and the other stated that surgery was not indicated. (*Id.*) She concludes that

13   because Dr. Pincock refused to move forward with the surgery and Dr. Gray found it was not

14   indicated, any delay in approval of the surgery did not harm Plaintiff. (*Id.*)

15                                          **b. Dr. Van Horn**

16        With respect to Plaintiff's allegation that Dr. Van Horn acted with deliberate indifference

17   when four appointments to extract his teeth were cancelled over the course of twenty-two days,

18   which caused undue pain and put off his surgery, Dr. Van Horn argues that he played no role in

19   the cancelled appointments. (Doc. # 89 at 12-13.) Instead, this was due to custody arrangements

20   at the prison. (*Id.* at 12.) Moreover, he argues that the delay of less than a month in extracting

21   Plaintiff's teeth was not in conscious disregard of a risk of serious harm to Plaintiff. (*Id.*) Plaintiff

22   had refused to have his teeth extracted on two prior occasions, and when he saw Dr. Pincock

23   prior to the time the extractions were to take place, Dr. Pincock described Plaintiff as being in no

24   distress. (*Id.*) Finally, Dr. Van Horn asserts that the cancellation of the appointments did not lead

25   to a delay in his jaw surgery, because to date no surgeon has been willing to operate on his jaw.

26   (*Id.* at 13.)

27                                          **c. Nurse Jacobs**

28        Nurse Jacobs contends that she was not deliberately indifferent to Plaintiffs' medical

1    needs because her responses to Plaintiff's kites, stating that the surgeon to most recently evaluate

2    Plaintiff said surgery was not indicated at that time, were accurate. (Doc. # 89 at 13-15.)

3                              **d. Defendant Gleason**

4          First, defendant Gleason addresses Plaintiff's claim that defendant Gleason was

5    deliberately indifferent when she responded to four kites relating to Plaintiff's cancelled

6    appointments in August and early September 2011. Defendant Gleason asserts that when a

7    patient is not in distress, their appointment may be rescheduled if there is insufficient custody

8    staff to escort the inmate to a medical or dental appointment. (Doc. # 89 at 15.)  When his

9    August 10, 2011 appointment was cancelled, defendant Gleason responded that Plaintiff was still

10   on the list and would be notified of another appointment. (*Id*.) In response to the appointments

11   postponed on August 25, 31, and September 1, 2011, she advised Plaintiff that he saw the dentist

12   on September 6, 2011, and Plaintiff had his teeth extracted on September 23, 2011. (*Id*. at 15-

13   16.)  She maintains that there was no urgency in the extractions, and the delay in extracting the

14   teeth did not cause harm. (*Id*. at 16.) Plaintiff's mouth required several months to heal before he

15   went back to the oral surgeon, who ultimately terminated him as a patient. (*Id*.) As a result,

16   defendant Gleason argues that Plaintiff cannot demonstrate that any delay in the extraction of the

17   teeth as a result of the cancelled appointments resulted in a delay in his receiving his surgery.

18   (*Id*.)

19         Next, defendant Gleason addresses her responses to Plaintiff kites following the

20   extraction of his teeth, where she stated that his dental care with Dr. Van Horn was complete and

21   there was no need for him to re-kite. (*Id*.at 16-17.) She acknowledges that Plaintiff began

22   sending kites that he was in pain following the extraction of his teeth. (*Id*. at 16.)  She says she

23   advised him that he would be scheduled, but did not determine the kite to present an emergent

24   situation. (*Id*.) Plaintiff sent another kite the following week, and was again advised he would be

25   scheduled; however, she claims that after the decision was made to refer Plaintiff back to

26   Dr. Pincock, it was determined that his dental was complete at NNCC until the oral surgeon

27   determined what the next step in his treatment would be. (*Id*.) She also mentions that soreness

28   was to be expected, and would be addressed by Dr. Pincock. (*Id*.)

1      She goes on to assert that when Plaintiff complained of "unbearable" pain, he was seen

2   the following day. (*Id*.) She contends that any delay in Plaintiff seeing the dentist between

3   October and December caused by her kite responses did not cause Plaintiff harm. (*Id*. at 17.)  She

4   asserts that he was ultimately seen by the dentist, and at that time he deferred receiving any

5   treatment until he was seen by the oral surgeon. (*Id*.)

6              **e. Defendant Elliott**

7      Defendant Elliott argues that she was not deliberately indifferent when she responded to

8   four of Plaintiff's kites over a period of about a month in 2011. (Doc. # 89 at 17-18.)

9      On May 10, 2011, Plaintiff asked when he would be scheduled for surgery, and defendant

10  Elliott responded that the dentist would review his chart. (*Id*. at 18.) Plaintiff kited again about

11  his surgery the following week, and defendant Elliott advised him he had missed his May 4,

12  2011 appointment and would need to see the dentist. (*Id*.) He kited again a week later, and was

13  advised that the dentist reviewed his chart again. (*Id*.) He then kited defendant Elliot regarding

14  the consultation requests pending before the URP, and she advised him his questions needed to

15  be directed to the review board. (*Id*.) Defendant Elliot asserts that these responses did not result

16  in a delay in Plaintiff's dental care or result in any harm to Plaintiff. (*Id*.) The referral to the oral

17  surgeon had been submitted to the URP before Plaintiff sent any of the kites to Elliott, and the

18  request was approved and Plaintiff was scheduled to see the oral surgeon on July 6, 2011. (*Id*.)

19          **f. Qualified Immunity & Official Capacity Damages**

20     Finally, Defendants argue that they are entitled to qualified immunity and should be

21  granted summary judgment with respect to Plaintiff's official capacity damages claims. (*Id*. at

22  19-20.)

23     **2. Plaintiff's Argument**

24     Plaintiff argues that he arrived at NNCC in April of 2011 to have his jaw evaluated and to

25  seek authorization for reconstructive jaw surgery, but after being there for a month, had not

26  heard from the dental department. (Doc. # 75 at 1-2.) He then asserts, in essence, that he was

27  given the run-around by defendant Elliott when he asked how to proceed. (*Id*. at 2-4.) He further

28  argues that defendant Gleason failed to answer his questions, and improperly told him that his

1    dental was complete, and that he should not re-kite the matter. (*Id.* at 4-5, 11-13.) He then states

2    that defendant Gleason responded to his complaints of pain and requests to see a dentist

3    following the extraction of his teeth that he initiated in October 2011 by stating that he was

4    placed on a priority list, but he was not seen until December 7, 2011. (*See id.* at 10-11, 14.)

5    When Plaintiff did see Dr. Van Horn on December 7, 2011, Dr. Van Horn gave him two options:

6    (1) a non-surgical procedure that might stop his pain, but may not provide any relief, delaying

7    any surgery; or (2) take ibuprofen as needed until the surgery in February 2012. (*Id.* at 14.)

8    Plaintiff elected to take the second option. (*Id.*)

9        He contends that the former nursing director, John Peery, advised him at the end of

10   November 2011 that his surgery was scheduled for February 2012, yet he has still not had the

11   procedure. (*Id.* at 12.) In direct contradiction to this representation, he was subsequently told he

12   would be only evaluated by the oral surgeon in February 2012. (*Id.* at 14-16.)

13        Plaintiff did see Dr. Pincock on February 7, 2012, for an evaluation only, and Plaintiff

14   claims that Dr. Pincock represented that if the results of blood tests he wanted performed were

15   normal, he would "strongly suggest" the surgery. (*Id.* at 16.)

16        Next, on February 24, 2012, Plaintiff initiated a grievance because the dentist

17   (Dr. Van Horn) and his assistant came to Plaintiff's door to evaluate and assess him for surgery.

18   (*Id.* at 17.) Plaintiff questioned what kind of an assessment Dr. Van Horn could have done at his

19   cell, and wondered why Dr. Van Horn was assessing him instead of Dr. Pincock, who would be

20   performing the surgery. (*Id.*)

21        Plaintiff found out on March 12, 2012, that the blood work Dr. Pincock had ordered was

22   normal, but a month went by and he did not hear anything more about the surgery, so he sent a

23   kite to the nurse (*Id.*) The unit nurse responded that Plaintiff would be seen to take impressions

24   for dentures, which was not the course Plaintiff thought the doctors would be taking if he was

25   moving toward surgery because he had already been told his jaw was too misaligned for

26   dentures. (*Id.* at 18.) He sent another kite, and the nurse told him that this was the approved

27   procedure for his condition "per dental." (*Id.* at 19.) Plaintiff also mentions that as of July 19,

28   2012, he still had not been seen for his complaints of pain that, even though defendant Gleason

1   had told him he was on the priority list in early May, 2012. (*Id*.)

2       When Plaintiff kited again about the surgery, John Peery told him there had been a

3   change in the plan of action by their dentist. (*Id*. at 21.) Plaintiff saw the dentist in early August

4   2012, to be fitted for dentures, but Plaintiff had a lot of questions regarding why the surgery had

5   not taken place. (*Id*. at 22.) Dr. Van Horn told Plaintiff there was nothing he could do but take

6   impressions for dentures. (*Id*.) Plaintiff did not want that done at that point. (*Id*.)

7       Plaintiff sent a kite a month and a half later, on September 26, 2012, and was informed at

8   that time that he had been approved for surgery. (*Id*. at 23.) Plaintiff went back to see

9   Dr. Pincock shortly thereafter, on October 9, 2012. (*Id*.) Plaintiff asserts that Dr. Pincock told

10   him he could perform a procedure that Dr. Van Horn could have performed at NNCC, or another

11   procedure if that one did not work, and then the surgery if the first two options were

12   unsuccessful. (*Id*. at 23-24.) When Plaintiff asked, Dr. Pincock confirmed that the first two

13   procedures were not surgeries. (*Id*. at 24.) Plaintiff told Dr. Pincock the surgery had already been

14   approved, which he contends Dr. Pincock did not know. (*Id*.) Plaintiff then mentioned that he

15   had filed a lawsuit, and Dr. Pincock told Plaintiff to leave his office. (*Id*. at 24-25.)

16       Plaintiff asserts that he still needs the jaw surgery he was previously promised. (*Id*. at 30.)

17   In support of his motion, Plaintiff submitted various kites and grievances, which were

18   summarized by the court, *supra*, III.B.

19   **D. Analysis**

20      **1. Defendant Elliott**

21       Plaintiff's claim against defendant Elliott focuses on her responses to Plaintiff's kites

22   regarding his dental care between May 10, 2011 and June 14, 2011.

23       By way of background, Plaintiff arrived at NSP (from HDSP) on April 7, 2011, after

24   Drs. Hanson and Sanders at HDSP had recommended that Plaintiff be transferred for extraction

25   of his teeth and referral to an orthopedic surgeon. (Doc. # 90-1 at 3; Doc. # 90-3 at 2-3; Doc.

26   # 108 at 7; Doc. #110-2 at 1.) Plaintiff saw Dr. Van Horn at NSP on March 27, 2011, and

27   Dr. Van Horn requested that Plaintiff be referred to the oral surgeon, which was approved by the

28   URP on May 4, 2011. (Doc. # 90-1 at 3; Doc. # 90-3 at 4; Doc. # 110-2 at 1.) Plaintiff was

apparently scheduled for a review with Dr. Van Horn on May 4, 2011, but it was subsequently noted that he did not keep the appointment. (Doc. # 90-1 at 3.) Plaintiff sent his first kite at NNCC regarding his jaw on May 10, 2011, asking whether he had been approved for surgery. (Doc. # 75 at 31.) Defendant Elliott responded two days later, stating that Dr. Van Horn would review his chart again. (*Id*.)

Plaintiff sent his second kite to Dr. Van Horn on May 20, 2011, stating that he had difficulty chewing, sharp pain in his mouth, and requested surgery. (Doc. # 75 at 32.) Defendant Elliott responded on May 26, 2011, that Plaintiff had been scheduled to see Dr. Van Horn on May 4, 2011 for a new evaluation, but missed the appointment, and Dr. Van Horn needed to see him in order to "write a new consult." (*Id*.)

On May 29, 2011, Plaintiff sent his third kite, asking when he would see Dr. Van Horn. (Doc. # 75 at 33.) Defendant Elliott responded two days later that Plaintiff saw Dr. Van Horn in March 2011, and Dr. Van Horn had looked at Plaintiff's chart again. (*Id*.)

Plaintiff sent his fourth kite two days later, on June 2, 2011, asking why he had been scheduled to see Dr. Van Horn on May 4, if he had seen him in March, and asked whether Dr. Van Horn still needed to see him to write a new consultation. (Doc. # 75 at 34.) Defendant Elliott responded the following day, stating that Dr. Van Horn "reviewed [Plaintiff's] chart and rewrote the order. So it's up to the next step." (*Id*.)

On June 9, 2011, Plaintiff sent his fifth kite, stating: "If Dr. Van Horn has reviewed my chart and rewrote the order. One, then what did the order originally say? And, two, what was it rewrote too [sic]? Lastly, what is the next step?" (Doc. # 67 at 19.) Defendant Elliott responded on June 14, 2011, stating that these questions would have to be answered by the review board. (*Id*.) John Peery also responded to the kite, stating that a response from the URP was pending. (*Id*.)

The court finds that defendant Elliott's responses to Plaintiff's five kites in May and June 2011, do not establish that defendant Elliott was deliberately indifferent to Plaintiff's serious medical needs. At the time of these exchanges, the medical evidence reveals that the plan of action was to have Plaintiff's remaining teeth extracted, and to have Plaintiff referred to the oral

surgeon. Plaintiff saw Dr. Van Horn at NSP on March 27, 2011, and his teeth were not extracted at that point, but Dr. Van Horn did submit a request that Plaintiff be referred to the oral surgeon, and that request was approved prior to the time Plaintiff sent his first kite on May 10, 2011. While there appears to have been some confusion with respect to whether and when Plaintiff would see Dr. Van Horn again once he arrived to NNCC, when Plaintiff asked about his status, defendant Elliott responded that Dr. Van Horn would review his chart, that he re-wrote the order (presumably the order that he be referred to the oral surgeon), and that the matter would be determined by the URP. John Peery advised Plaintiff that the matter was pending before the URP, and Plaintiff ultimately saw the oral surgeon by July 6, 2011. There is no evidence that the brief delay during the period of time that defendant Elliott was responding to Plaintiff's kites from May to June 2011 caused any harm given that Plaintiff saw the oral surgeon on July 6, 2011.

Therefore, the court recommends that Plaintiff's motion for summary judgment against defendant Elliott be denied, and that defendant Elliott's motion for summary judgment be granted.

**2. Defendant Gleason**

It appears that defendant Gleason picked up where defendant Elliott left off as the dental assistant or technician at NNCC. Plaintiff's claim against defendant Gleason is centered on defendant Gleason's responses to Plaintiff's kites during the time frame of July 2011 through the beginning of December 2011.

**a. June/July 2011 Kites and August/September 2011 Appointment Scheduling Issues**

Plaintiff continued sending kites regarding the status of his dental issues following defendant Elliott's responses to his inquiries in June 2011. He sent a kite asking what the next step was on June 16, 2011, and asked what the URP was and why his surgery was pending before them on June 22, 2011. (Doc. # 75 at 35-36.)

Defendant Gleason responded to Plaintiff's June 16 kite on July 7, 2011, stating that he would be notified of the URP's decision, and that he should not re-kite until he was notified of

1    the decision. (Doc. # 75 at 35.)

2        Defendant Gleason also responded to Plaintiff's June 22, 2011 kite on July 7, 2011,

3    stating that the URP makes decisions regarding whether or not procedures are approved. (Doc.

4    # 75 at 36.) She stated that Dr. Van Horn is not on the panel, that Plaintiff needed to be patient

5    and that he should not re-kite until a decision had been made. (*Id.*)

6        In the interim, Plaintiff was seen by Dr. Pincock on July 6, who concluded that all of

7    Plaintiff's teeth would need to be removed to properly address the jaw deformity issue, and once

8    that occurred, further consideration could be given to reconstructive surgery. (Doc. # 90-4 at 2.)

9        On July 18, 2011, NNCC received Dr. Pincock's notes, and a recommendation was made

10   for the extractions and Plaintiff was to be scheduled with Dr. Van Horn. (Doc. # 90-5 at 7.)

11       Plaintiff sent a kite on July 31, 2011, asking what the purpose was for his visit with

12   Dr. Pincock, and asking for his conclusions. (Doc. # 75 at 41.) Defendant Gleason responded on

13   August 3, 2011, that she would make an appointment with a dentist to go over the conclusions

14   with Plaintiff. (*Id.*)

15       Plaintiff had appointments scheduled on August 10, and 25, 2011, and September 1,

16   2011, but did not see the dentist until September 6, 2011. (Doc. # 75 at 42-49, 51.) According to

17   defendants, this was due to custody issues. (Doc. # 89-8 ¶ 7.) Defendant Gleason eventually

18   responded to Plaintiff's kites regarding these appointments by stating that he was seen on

19   September 6, 2011. (Doc. # 75 at 42-49, 51.) Plaintiff sent a kite on September 6, 2011, stating

20   he had additional questions for the dentist, and was told he would be given an appointment.

21   (Doc. # 75 at 52.) His teeth were extracted on September 23, 2011. (Doc. # 90-1 at 3-4; Doc.

22   # 89-8 ¶ 9.)

23       To the extent Plaintiff claims that defendant Gleason's responses to Plaintiff's kites of

24   June 16, 22, and July 31, 2011, as well as the rescheduling of appointments in August and early

25   September 2011 amount to deliberate indifference, the court disagrees. Defendant Gleason's

26   responses to Plaintiff's June 16 and 22 kites advised Plaintiff that the URP determined whether

27   procedures would be approved or not, that he would be informed of the URP's decision, and to

28   be patient. Plaintiff takes issue with her statements that he should not send another kite on the

1    issue, but this does not establish deliberate indifference. She was simply stating that Plaintiff

2    would be informed as soon as the URP had made a decision. Her statement did not cause

3    Plaintiff any harm. Nor has he established that her statements that he should not re-kite the issue

4    in fact hampered Plaintiff's ability to send kites regarding his dental condition, *i.e.*, if he was

5    experiencing pain.

6         With respect to the rescheduling of appointments in August and early September 2011,

7    there was a delay of a few weeks before Plaintiff saw Dr. Van Horn to have his teeth extracted

8    on September 23, 2011. For a delay to rise to the level of deliberate indifference, a plaintiff must

9    show resulting harm. None of the kites to which defendant Gleason responded included

10    complaints of pain or otherwise put defendant Elliott on notice that a delay in scheduling the

11    extraction of his teeth would subject Plaintiff to a serious risk of harm.

12         In conclusion, the court recommends that Plaintiff's motion be denied and defendant

13    Gleason's motion be granted insofar as this claim is concerned.

14        **b. October/November/December 2011 Kites**

15         Following the extraction of his teeth on September 23, 2011, Plaintiff sent his next kite

16    on October 11, 2011, stating that his gums and jaw were in pain following the extractions.

17    (Doc. # 75 at 53.) Defendant Gleason told him he would be scheduled. (*Id.*) He sent a second kite

18    on October 18, 2011, stating that his gums and jaw still hurt, and asked to see a dentist. (Doc.

19    # 75 at 50.) He sent a third kite on October 30, 2011, stating he was still in pain. (Doc. # 75 at

20    55.) Defendant Gleason responded: "your dental is complete. You will be seeing an oral surgeon

21    for your jaw bone in the near future." (*Id.*) He sent yet another kite that day asking whether he

22    was approved for surgery, and John Peery responded that he had not yet been approved and the

23    matter was still under discussion. (Doc. # 75 at 56.) Defendant Gleason responded to Plaintiff's

24    October 18, 2011 kite on November 3, 2011, stating that Plaintiff had been placed on the priority

25    dental care list and would be seen as soon as the schedule permitted. (Doc. # 75 at 50.) That

26    same day, Dr. Gedney sent a request that Plaintiff be referred back to Dr. Pincock. (Doc. # 90-3

27    at 5.) Notations on the request indicate that the extractions had been performed by Dr. Van Horn,

28    Plaintiff needed to heal for several months, and would be re-evaluated by Dr. Pincock on

1  February 7, 2012. (Doc. # 90-3 at 5-6.)

2       Plaintiff sent another kite on November 9, 2011, stating that he had still not seen a dentist

3  and the pain in his mouth was causing inconsistencies in his sleeping patterns. (Doc. # 75-1 at 1.)

4  He then sent four kites on November 27, 2011, asking whether his surgery had been approved by

5  the URP, for Dr. Pincock's conclusions following the July appointment, what Dr. Van Horn's

6  orders were in March 2011, and what the purpose was of the appointment scheduled (but

7  apparently missed) on May 4, 2011. (Doc. # 75 at 57-59; Doc. # 75-1 at 5.)

8       John Peery told Plaintiff surgery was scheduled for February 2012. (Doc. # 75 at 58.) In

9  response to his inquiries about Dr. Van Horn, defendant Gleason responded that the kites

10  Plaintiff was referring to were old, and stated again: "your dental is complete."  (Doc. # 75 at

11  59.)

12      Defendant Gleason responded to Plaintiff's November 9, 2011 kite on December 1, 2011,

13  stating: "You no longer need to see the dentist. Your treatment with him is complete. Your oral

14  surgeon Dr. Pincock will be working on your jaw. No need to re-kite. You will be notified."

15  (Doc. # 75-1 at 1.)

16      Plaintiff sent another kite on December 3, 2011, complaining of pain in his mouth. (Doc.

17  # 90-1 at 4.) He followed this up with an emergency grievance on December 6, 2011, stating that

18  the pain had become unbearable. (Doc. # 75-1 at 2-3.) He saw Dr. Van Horn the next day, on

19  December 7, 2011. (Doc. # 89-8 ¶ 10.)

20      In sum, the evidence reveals that Plaintiff sent three kites in October 2011, one on

21  November 9, 2011, and another on December 3, 2011, complaining of pain following his

22  September 23 teeth extractions. Defendant Gleason responded to these kites by either telling

23  Plaintiff that he had been placed on a priority dental list or that his dental was complete and that

24  he would be seeing the oral surgeon. Yet he did not see anyone for his pain until December 7,

25  2011, and he had already been advised that he would not see the oral surgeon until February

26  2012, when he thought he would get his surgery.

27      This evidence supports Plaintiff's claim of deliberate indifference against defendant

28  Gleason insofar as it reflects a delay in the receipt of medical care despite continuing complaints

1    of pain and assurances that he would be seen, either by placement on the priority dental care list

2    or by the oral surgeon.

3         Dr. Van Horn elaborates on defendant Gleason's argument that she was not deliberately

4    indifferent in responding to Plaintiff's kites during this time period. Dr. Van Horn acknowledges

5    in his declaration that Plaintiff sent kites to the clinic following the extractions. (Doc. # 89-8 ¶ 7.)

6    He states that soreness was expected, given that Plaintiff had his remaining teeth extracted, and

7    this was intended to be addressed by the oral surgeon. (*Id*. ¶ 10.) When Plaintiff complained of

8    unbearable pain in his December 6, 2011 grievance, Dr. Van Horn saw him the very next day.

9    (*Id*.) This evidence supports the position that defendant Gleason (and Dr. Van Horn, as addressed

10   *infra*, III.D.3) was not deliberately indifferent to Plaintiff's serious medical needs.

11        While Dr. Van Horn maintains that the expected soreness following the extractions was

12   intended to be addressed by the oral surgeon, neither defendant Gleason nor Dr. Van Horn

13   addresses the fact that Plaintiff sent five kites from October through the beginning of December

14   2011, complaining of pain, and he was advised by John Peery at the end of November 2011 that

15   he would not be seeing the oral surgeon until February 2012. This suggests that Plaintiff did

16   suffer harm as a result of the delay in being seen.

17        Defendant Gleason and Dr. Van Horn point out that when Dr. Van Horn did see Plaintiff

18   on December 7, 2011, following his grievance asserting he was in "unbearable" pain, he elected

19   to defer treatment until he saw Dr. Pincock. This tends to show that Plaintiff did not really suffer

20   any harm as a result of the delay. On the other hand, Plaintiff was told by Dr. Van Horn to

21   request ibuprofen from the nursing staff as needed, which weighs in favor of finding he did

22   suffer harm as a result of the delay.

23        With these competing versions of events, the court finds that a genuine dispute of

24   material fact exists as to whether Plaintiff suffered  harm as a result of the delay from October,

25   when he began submitting kites that he was in pain following the extractions, until he was seen

26   by Dr. Van Horn on December 7, 2011. As such, the court recommends that both Plaintiff and

27   defendant Gleason's motions for summary judgment be denied as to the Eighth Amendment

28   deliberate indifference claim against defendant Gleason related to her responses to Plaintiffs

kites in October, November and December 2011.

### 3. Defendant Van Horn

#### a. Cancellation of Appointments in August/September 2011

The court has already determined (*see, infra,* III.D.1) that the cancellation of a series of appointments in August and early September 2011 does not amount to the level of deliberate indifference. Therefore, insofar as Dr. Van Horn is implicated in this claim, Plaintiff's motion should be denied, and Dr. Van Horn's motion should be granted.

#### b. Kites from October-December 2011

The court has also determined (*see, infra*, III.D.2) that a genuine dispute of material fact exists as to whether the delay from the time Plaintiff complained of pain following the September 23 extractions and when he was finally seen by Dr. Van Horn on December 7, 2011 amounts to deliberate indifference. The reasoning discussed with respect to defendant Gleason applies to this claim against Dr. Van Horn. As such, both Plaintiff's and Dr. Van Horn's motions should be denied as to this claim.

#### c. Dr. Van Horn's Involvement in Plaintiff's Dental Care from February 2012 through September 2012

The court will now address the claim that Dr. Van Horn was deliberately indifferent to his serious medical needs because he was otherwise responsible for the delay in Plaintiff receiving his surgery.

Following Plaintiff's February 7, 2012 evaluation by Dr. Pincock, Dr. Van Horn attempted to examine Plaintiff's mouth in his cell on February 21, 2012, because Dr. Pincock asked him to evaluate whether aggressive osteopathy of the mandible would achieve closer alignment sufficient to accommodate dentures for Plaintiff. (Doc. # 89-8 at 4 ¶ 11.) Plaintiff filed a grievance related to this incident, where he asked why Dr. Van Horn would be evaluating Plaintiff in his cell, rather than his office, and why Dr. Van Horn was evaluating him if Dr. Pincock would be performing the surgery. (Doc. # 75-1 at 7-9.) In his declaration, Dr. Van Horn explains that it is not unusual for him to evaluate a lockdown inmate, such as Plaintiff, in his cell, if the evaluation does not require specialized equipment, to eliminate the

1    burden on custody staff of transporting the inmate to the dental clinic. (Doc. # 89-8 ¶ 12.) In any

2    event,

3    Dr. Van Horn's effort to evaluate Plaintiff in his cell certainly does not amount to deliberate

4    indifference.

5         The results of Plaintiff's blood work ordered by Dr. Pincock came back normal on

6    March 8, 2012 (Doc. # 90-6 at 3), and Dr. Van Horn went back to Plaintiff's cell to evaluate him

7    on April 3, 2012. (Doc. # 89-8 ¶ 13; Doc. # 90-1 at 4.) At that point, it was Dr. Van Horn's

8    opinion that they should attempt to fit Plaintiff with dentures before considering to proceed with

9    surgery. (*Id*.) When Plaintiff sent a kite later that month asking about the surgery, he was advised

10   on May 2, 2012 that Dr. Van Horn would see him for denture impressions which may eliminate

11   the need for surgery. (Doc. # 75-1 at 10.) Plaintiff sent several more kites questioning why

12   denture impressions would be taken when he had been told by the dentists at HDSP that his jaw

13   alignment would not allow for dentures to be made for him. (Doc. # 75-1 at 11, 12.) In the

14   second kite on this issue, sent on May 17, 2012, Plaintiff also stated that he was in pain, and was

15   told he would be placed on the priority care list. (Doc. # 75-1 at 12.)

16        Plaintiff saw Dr. Van Horn on May 24, 2012, and Dr. Van Horn posed various options to

17   Plaintiff, including making dentures or trying alveoloplasty before surgery, and Plaintiff said he

18   would think about it and no denture impressions were taken. (Doc. # 90-1 at 4; Doc. # 89-8

19   ¶ 14.) Plaintiff sent a kite on May 28, 2012, asking whether he had been approved for surgery,

20   and was told not yet. (Doc. # 108 at 49.) He made this inquiry again in July 2012, and John Peery

21   told him there was a new plan of action by the dentist. (Doc. # 75-1 at 14.) After receiving this

22   response, he sent another kite on July 19, 2012, stating that he was experiencing pain associated

23   with his jaw, and was told he was being scheduled for impressions. (Doc. # 75-1 at 13.) Plaintiff

24   saw Dr. Van Horn on August 9, 2012. (Doc. # 90-1 at 4.) Dr. Van Horn once again presented

25   Plaintiff with the options of going forward with dentures or undergoing alveoloplasty, healing

26   and then dentures, but Plaintiff refused those options and insisted on seeing Dr. Pincock to go

27   ahead with the surgery. (Doc. # 90-1 at 4; Doc. # 89-8 ¶ 15.) As a result, Dr. Van Horn emailed

28   the medical and nursing directors that Plaintiff would only be happy with jaw surgery (*id*.), and

1    submitted a formal request for referral to Dr. Pincock on September 12, 2012. Doc. # 89-8 ¶ 16;

2    Doc. # 90-1 at 4; Doc. # 90-3 at 7.) The request was approved by the URP. (*Id.*) Plaintiff was

3    advised on September 26, 2012 that the surgery was approved and was in the process of being

4    scheduled. Doc. # 75-1 at 15.) Dr. Van Horn's had no further involvement with Plaintiff's dental

5    issues.

6        The court finds no evidence of deliberate indifference on the part of Dr. Van Horn

7    between February and September of 2012, when his involvement with Plaintiff's dental care

8    ceased. In February 2012, Dr. Van Horn attempted to evaluate Plaintiff's condition pursuant to

9    Dr. Pincock's request. Whether it was because Plaintiff became belligerent or Plaintiff did not

10   understand why Dr. Van Horn was evaluating him in his cell, Dr. Van Horn was unable to

11   complete his evaluation of Plaintiff at that time. When the results of the blood work ordered by

12   Dr. Pincock came back normal, Dr. Van Horn went back to evaluate Plaintiff and gave his

13   opinion that they should try fitting Plaintiff with dentures before moving on to more aggressive

14   forms of treatment. Plaintiff disagreed and sent several kites inquiring about this course of

15   action. When he complained of pain on May 17, 2012, he was seen by Dr. Van Horn on May 24,

16   2012. At that time, Dr. Van Horn presented Plaintiff with options, but Plaintiff elected not to

17   proceed with them at that time. He sent several kites asking about approval of surgery and was

18   told he had not been approved. When he kited about pain again on July 19, 2012, he was seen by

19   Dr. Van Horn shortly thereafter, on August 9, 2012. Dr. Van Horn again presented Plaintiff with

20   options, and when Plaintiff was adamant about only proceeding with surgery, Dr. Van Horn

21   made the request for a referral back to Dr. Pincock for surgery.

22       While Plaintiff might disagree with Dr. Van Horn's opinion regarding the course of

23   action for Plaintiff's condition, Dr. Van Horn was responsive to Plaintiff's complaints of pain,

24   recommended non-surgical options, and ultimately referred him for the surgery he requested.

25   Plaintiff has not presented evidence that Dr. Van Horn's proffered course of treatment was

26   "medically unacceptable" under the circumstances, or that it was offered "in conscious disregard

27   of an excessive risk to plaintiff's health." *See Snow*, 681 F.3d at 988 (citation omitted). Plaintiff

28   argues that he had already been told by the dentist at HDSP that his jaw was too malaligned for

dentures, but the medical records reflect that Dr. Sanders recommended extraction of Plaintiff's remaining teeth for complete denture fabrication after the mandible and maxilla were aligned. (Doc. # 90-1 at 3.) Dr. Sanders recommended that Plaintiff be transferred to NNCC to see Dr. Van Horn or another NNCC dentist, and then an oral surgeon. (Doc. # 90-3 at 2-3.) When Plaintiff saw Dr. Pincock initially, he recommended that in order to address Plaintiff's jaw deformity, Plaintiff would need his infected teeth extracted, and once that occurred further consideration could be given to reconstructive surgery. (Doc. # 90-4 at 2.) When he saw Dr. Pincock again on February 7, 2012, Dr. Pincock said that if his blood work came back normal, he would consider surgery. (Doc. # 90-4 at 5.) Following this appointment, he asked Dr. Van Horn to evaluate Plaintiff to determine whether he was a good candidate for the surgery, and Dr. Van Horn thought that so much bone would have to be removed to allow for proper alignment of the jaw that there would be little to no bone ridges left to retain the dentures. (Doc. # 89-8 at 4 ¶ 13.) Therefore, he recommended trying dentures in Plaintiff's current condition, and if that was unsuccessful, then surgery could be considered. (*Id*.) These facts do not point to a medically unacceptable course of action taken in conscious disregard of Plaintiff's health.

Therefore, to the extent Plaintiff contends that Dr. Van Horn was deliberately indifferent to his serious medical needs from February 2012 through September 2012, the court recommends that Plaintiff's motion be denied and that Dr. Van Horn's motion be granted.

### d. Miscellaneous Arguments

The court agrees that the fact that Dr. Van Horn did not take any x-rays (Pl.'s argument, Doc. # 108 at 4) does not amount to deliberate indifference. As Defendants point out, x-rays were taken at HDSP before Plaintiff saw Dr. Van Horn initially and again by Dr. Pincock, who recommended the extractions.

The court similarly finds Plaintiff's statement that Plaintiff was initially transferred to NSP instead of NNCC, and saw Dr. Van Horn at NSP on a Sunday (*see* Doc. # 75 at 1), does not amount deliberate indifference. The fact that Dr. Van Horn initially saw Plaintiff at an institution other than NNCC on a Sunday is immaterial to the substance of the dental care Dr. Van Horn provided to Plaintiff.

**4. Dr. Gedney**

Plaintiff's claim against Dr. Gedney is based on the fact that she is a member of the URP. (Doc. # 67 at 10.) Plaintiff contends that Dr. Gedney was deliberately indifferent to his serious medical needs because while the URP eventually approved Plaintiff for jaw surgery, it has yet to be performed. (*Id.*)

Dr. Gedney is correct that there is no evidence that she contributed to the delay in Plaintiff receiving his surgery, because each time a request was presented to her as a member of the URP, the request was approved. The initial request to refer Plaintiff to Dr. Pincock was approved, and Plaintiff saw Dr. Pincock in July 2011. (Doc. # 90-3 at 4; Doc. # 90-4 at 2.) After Plaintiff's teeth were extracted by Dr. Van Horn, Dr. Gedney sent another request that Plaintiff be referred back to Dr. Pincock, and it was determined that he would be evaluated by Dr. Pincock again after he had healed from the extractions. (Doc. # 90-3 at 5-6.) Plaintiff saw Dr. Pincock in February 2012. (Doc. # 90-4 at 3, 5.) Dr. Pincock requested blood work, and as soon as the results came back as normal, Dr. Gedney said they should be sent to Dr. Pincock to determine whether to move forward with the surgery. (Doc. # 90-4 at 3, 5; Doc. # 90-6 at 3.)

Following the February 2012 appointment, Dr. Pincock asked Dr. Van Horn to evaluate Plaintiff, and ultimately, Dr. Van Horn sent a request for referral back to Dr. Pincock for surgery, which the URP approved the same day. (Doc. # 90-1 at 4; Doc. # 89-8 ¶ 16; Doc. # 90-1 at 4; Doc. # 90-3 at 7.)

When Plaintiff saw Dr. Pincock in October 2012, he mentioned his lawsuit and Dr. Pincock indicated he would not continue to treat Plaintiff. (Doc. # 90-4 at 3.) A request was subsequently made to refer Plaintiff to another oral surgeon, Dr. Gray, which the URP also approved. (Doc. # 90-3 at 8.) Dr. Gray opined surgery was not indicated at that time. (Doc. # 90-4 at 6-8.) The matter did not surface before Dr. Gedney again until April 2014, when she was seeing him related to knee pain. (Doc. # 89 at 7; Doc. # 90-5 at 2-3; Doc. # 110-1 at 1.)  She specifically noted that Plaintiff still wanted to go through with reconstructive surgery, and the very same day Dr. Gedney sent a request to the URP that Plaintiff be referred to another oral surgeon. (Doc. # 90-5 at 2, 9.)  The URP approved the request. (Doc. # 90-5 at 9.)

1    Dr. Gedney requested Plaintiff's transfer to HDSP to see the oral surgeon, and he arrived

2    there almost two weeks later. (Doc. # 108 at 54; Doc. # 110-1 at 4.) There was apparently a

3    mishap at HDSP (which Plaintiff does not attribute to Dr. Gedney) and he did not see the oral

4    surgeon, but was returned to NNCC on May 22, 2014. (Doc. # 108 at 55; Doc. # 110-1 at 4.)

5    When Plaintiff saw Dr. Gedney again at NNCC on June 18, 2014, she ordered that he be returned

6    to HDSP to see an oral surgeon. (Doc. # 108 at 56; Doc. # 110-5 at 1.) He saw Dr. Swanson in

7    Las Vegas on July 22, 2014. (Doc. # 108 at 56; Doc. # 110-5 at 1.) According to Plaintiff,

8    Dr. Swanson said the surgery was not necessary for a variety of reasons. (Doc. # 108 at 56-57;

9    Doc. # 110-5 at 1-2.)

10    Neither party has submitted any evidence reflecting what has come to pass since Plaintiff

11    saw the third oral surgeon in July 2014; however, that oral surgeon's opinion not to move

12    forward with surgery cannot be attributed to Dr. Gedney. Instead, each time Dr. Gedney was

13    presented with a request for action concerning Plaintiff's dental care as a member of the URP, the

14    requests were approved, and in a timely manner.

15    As a result, the court recommends that Plaintiff's motion should be denied as to

16    Dr. Gedney, and Dr. Gedney's motion should be granted.

17    **5. Defendant Jacobs**

18    Defendant Jacobs took over as the nursing director at NNCC after John Peery's departure.

19    Plaintiff's claim against her is based on her responses to his kites of September 12, 2013,

20    October 7, 2013, November 25, 2013, and March 24, 2014.

21    Plaintiff's September 12, 2013 kite stated that he had been told by John Peery on

22    October 15, 2012 that his surgery had been approved by the URP, and asked whether he would

23    be scheduled any time soon. (Doc. # 67 at 11; Doc. # 75-1 at 24.) Defendant Jacobs responded

24    on October 3, 2013, stating that Plaintiff had seen Dr. Gray on January 28, 2013, and he had not

25    recommended surgery. (Doc. # 75-1 at 24.)

26    Plaintiff sent defendant Jacobs another kite on October 7, 2013, saying he did not recall

27    Dr. Gray; that he had seen Dr. Pincock; and asked why he would have been sent to see Dr. Gray.

28    (Doc. # 75-1 at 26.) Defendant Jacobs responded on October 10, 2013, stating that Plaintiff had

1   seen Dr. Gray in January 2013, and "no surgery was written to be done."

2       He complained of jaw pain on October 24, 2013, and was given a bottle of ibuprofen and

3   was instructed to kite if he had no improvement. (Doc. # 90-5 at 5.) He was seen on November 6,

4   2013, and was issued a pain pack. (Doc. # 90-5 at 5.)

5       Plaintiff sent a third kite to defendant Jacobs on November 25, 2013, asking again why

6   he would have been sent to see Dr. Gray. (Doc. # 67 at 13; Doc. # 75-1.) He indicated that he had

7   found some notes regarding his visit with Dr. Gray (whereas he had previously stated he did not

8   remember seeing Dr. Gray), but still did not know why he saw him and not Dr. Pincock. (*Id*.) He

9   also asked whether he had been approved for surgery. (*Id*.) Defendant Jacobs responded on

10  December 3, 2013, stating that the NNCC provider sent Plaintiff for another opinion from

11  Dr. Gray and he determined surgery was not indicated. (*Id*.) Plaintiff had apparently forgotten

12  that Dr. Pincock had refused to see him any longer when he mentioned his lawsuit.

13      On January 7, 2014, Plaintiff received a pain pack for his jaw pain. (Doc. # 90-5 at 5.) He

14  was transferred to LCC later that month, and returned to NNCC in March 2014. (Doc. # 90-5 at

15  2-4.)

16      On March 24, 2014, he sent the fourth kite to defendant Jacobs referencing John Peery's

17  November 28, 2011 kite response stating that Plaintiff was scheduled for surgery in February

18  2012, and asked defendant Jacobs why the surgery had not taken place. (Doc. # 75-1 at 25.)

19  Defendant Jacobs once again responded that Plaintiff had been sent to Dr. Gray who determined

20  surgery was not necessary. (*Id*.)

21      The court finds that defendant Jacobs was not deliberately indifferent to Plaintiff's serious

22  medical needs in responding to these four kites. At the time defendant Jacobs was responding to

23  Plaintiff's kites, Dr. Van Horn had recommended referral of Plaintiff back to Dr. Pincock for

24  surgery, which was approved by the URP; however, when Plaintiff saw Dr. Pincock and

25  referenced the litigation, Dr. Pincock refused to treat him. Plaintiff was subsequently referred to

26  another oral surgeon, Dr. Gray, who concluded that surgery was not indicated. Therefore,

27  defendant Jacobs responses to Plaintiff's kites asking about the status of his surgery were

28  accurate. When he saw Dr. Gedney and discussed the issue in April 2014, he was referred to

another oral surgeon. There is no evidence that defendant Jacobs caused any delay in Plaintiff obtaining his surgery because when he was engaged in conversations with defendant Jacobs, the oral surgeon who had most recently examined Plaintiff said the surgery was not indicated. Even if a delay could be attributed to defendant Jacobs, there is no evidence of harm as a result of the delay. When Plaintiff complained of pain during this timeframe, he was seen and issued pain packs to address his concerns.

Accordingly, the court recommends that Plaintiff's motion against defendant Jacobs be denied, and defendant Jacobs' motion be granted.

**E. Official Capacity Damages**

"[F]ederal courts are barred by the Eleventh Amendment from awarding damages against state officials acting in their official capacities[.]" *Snow v. McDaniel*, 681 F.3d 978, 991 (9th Cir. 2012) (citing *Bank of Lake Tahoe v. Bank of Am.*, 318 F.3d 914, 918 (9th Cir. 2003)).

Accordingly, Defendants' motion should be granted insofar as Plaintiff seeks to recover money damages against any defendant in his or her official capacity.

**F. Qualified Immunity**

Insofar as the court has recommended granting summary judgment in favor of certain defendants as to certain claims, it need not address Defendants' qualified immunity argument. As to the claims that the court has recommending denying Defendants' motion for summary judgment, the court has found that a genuine dispute of material fact exists which precludes the court from determining qualified immunity at this juncture. *See Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **DENYING** Plaintiff's dispositive motion (Doc. # 75) and **GRANTING IN PART AND DENYING IN PART** Defendants' motion for summary judgment (Doc. # 89) as follows:

(1) The motion should be **GRANTED** as to Plaintiff's claim against defendant Elliott;

(2) The motion should be **GRANTED** as to Plaintiff's claim against defendant Gleason related to her responses to Plaintiff's June and July 2011 kites, and related to his claims regarding

1   to the cancellation of his appointments in August and early September 2011;

2   (3) The motion should be **DENIED** as to Plaintiff's claim against defendant Gleason

3   related to her responses to Plaintiffs kites in October, November and December 2011, and the

4   delay in Plaintiff being seen regarding his complaints of pain during that time;

5   (4)  The motion should be **DENIED** as to Plaintiff's claim against Dr. Van Horn related

6   to Plaintiffs kites in October, November and December 2011 and the delay in Plaintiff being seen

7   regarding his complaints of pain during that time; the motion should otherwise be **GRANTED** as

8   to Dr. Van Horn;

9   (5) The motion should be **GRANTED** as to Dr. Gedney;

10  (6) The motion should be **GRANTED** as to defendant Jacobs;

11  (7) The motion should be **GRANTED** insofar as Plaintiff seeks to recover money

12  damages against Defendants in their official capacities.

13  The parties should be aware of the following:

14  1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

15  this Report and Recommendation within fourteen days of receipt. These objections should be

16  titled "Objections to Magistrate Judge's Report and Recommendation" and should be

17  accompanied by points and authorities for consideration by the district judge.

18  2. That this Report and Recommendation is not an appealable order and that any notice of

19  appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

20  until entry of judgment by the district court.

21  DATED: January 26, 2014

22

23  _____

WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28